11-1267 Alden Leeds, Inc. v. National Labor Relations Board Mr. Ferenczo for the petitioner, Mr. Barrett for the respondent Good morning, Your Honors. Good morning. This appeal presents a relatively simple issue I would submit to the Court. The period from September 30, 2009 through October 3, 2009, when the lockout in this case commenced, there is no dispute. It is confirmed by fact findings of the ALJ and the Board below. That the position of the petitioner, Alden Leeds, consistently was, given the economic turbulence that existed in America at that time, that it would do nothing more and nothing less than extend the terms and conditions of the contract that had expired for a period of one year. That seems relatively clear right up until the email of the 30th. Correct. Very well, I'll get right to the heart of it, because that's the crux of this case. We submit to the Court that the determination here by the ALJ and ultimately adopted by the Board, completely misconstrued and did not understand certain basic underlying facts set forth in that October 30th email. So here's the state of the record, and this is not disputed. The ALJ found, this is at JA 25, that on October 30, Epstein, the president of Alden Leeds, had a telephone conversation with Tricoli, the union negotiator. And at that time, it was clear, and he found as a fact, that Epstein conveyed, quote, I don't want to pay any more, I want to keep everything the same for one year. That telephone conversation occurs between the two of them on October 30th. Before the email is sent. Before the email is sent. Well, that makes sense. We can start with the email and end with the email. That's fair, although I would submit to the Court that in understanding the email, it has to be placed in context, and the context is what occurred during those discussions that day. So they have the conversation. He makes it clear, as he had throughout the preceding month, that there would be no change in the position. Everything would remain the same. And there would be a, quote, freeze. The email then comes that afternoon. And in the findings of the ALJ adopted by the Board, this is the basis for the entirety of their claim and the finding that there was some confusion with regard to the offer. The email, which is at JA 64, does the following. It makes plain. It confirms the course of the discussions over 30 days. It provides that during the 30 days since the agreement between the parties expired, we at the company have tried our best to come up with an alternative medical plan that would cost the same or less than the proposed increase for the union plan. Let me make plain, as the record does, as of this date, the expiring contract, as set forth in the record below, and again, this is undisputed, the company was paying $20,000 per month in medical contributions to the union, which accepted those monies and then utilized them for a union-controlled insurance plan. At this time, Alden Leeds, when they sent this email, was confirming that back on October 22nd, reflected in JA 119, there was a letter, email from Epstein to the union stating, we're spending $20,000 a month. Your offer of September 30th proposed to increase our health care contribution to $35,000 a month. We will not do that. But what we will do, we'll pay the continued amount of $20,000. And all that was happening is Epstein and the company were suggesting to the union that if you go outside your own captive plan, there are ways you can take the $20,000 that we will continue to pay under our proposal, and you can buy another policy which will provide different and better and more coverage. So as of the date of the email, JA 64, Epstein is doing nothing more than confirming the conversation that he had with Tricoli, in which he says, we tried our best for 30 days. We sent you these plans, evidenced by JA 119, the proposal with all these different options they could consider. And he says, our best efforts resulted in a plan that, one, requires medical interview, two, does not include dental, three, does not include optical, four, did not cost less than the expiring plan. However, if we were to eliminate family coverage and go to single coverage for all union members, it would cost less, and therefore there would be a saving. So if we pay you the $20,000 per month, which is the freeze, which had always been their position, and you go ahead and you change your plan from the union-controlled plan to a private plan, you can benefit your members to the tune of about $400 a month, because we're going to continue to pay the same thing, no matter what. He goes on to confirm that in that conversation, that very day, October 30th, as confirmed in the record, as confirmed in the fact findings by the ALJ, that, quote, John Tricoli stated that he had been unaware of this option, but regardless, that the union will keep the existing plan. The union was unwilling to move from the union-controlled plan to consider taking the $20,000 and buying private plans that might afford better coverage. So this e-mail does nothing more at this point than confirm the conversation of the 30th, that the union had rejected this concept of taking the $20,000 per month, which had always been the company's position, never changed, never wavered. But the ALJ and the board interpreted this e-mail as creating an ambiguity, because it mentioned the other plan. Yes, Your Honor. And for you to win here, you have to convince us that that finding is patently unsupportable. Well, not just that you disagree with it. As I understand it, my burden is to show that there is not substantial evidence to support that finding. That's the standard of review as I understand it. And so the substantial evidence, this is the e-mail. We can read the e-mail, and I don't think this court or anyone is bound by an interpretation of the e-mail that may be made by someone else. Sure we are. This e-mail says what it says. Wait, wait, wait. Sure we are. Excuse me? We don't do that, De Novo. We look to see whether or not, pursuant to the substantial evidence test, the board and ALJ's interpretation is satisfactory, not whether we would have come to a different interpretation than they did. The substantial evidence in the record consists not only of the e-mail. I understand, taking it all into account. But we don't do it, De Novo. Understood. But we also have fact findings of the ALJ, and these fact findings include the finding that, and this is a JA-23 that on November 2nd, when the union president DeVito then asked about this e-mail, they discussed the e-mail, they were considering what to do with this proposal. At that time, he asked Cunningham for a summary of the developments, and they confirmed at JA-23, the fact finding, that the company had proposed again a freeze. There was no dispute from the testimony on the record that when they discussed this after the offer came in, they knew exactly what the position was. They read it. They understood it. They never sought a clarification, and when they discussed it internally, they confirmed and agreed that it meant nothing more or nothing less than what had been the position since September 30th, there would be a freeze. Where's that? This is at... Tell me what they concluded was they had no clue as to what to vote on. Right. In light of this e-mail. So tell me what you're referring to. I'm referring to JA-23, which is a fact finding of the ALJ, which it provides and states that the union president DeVito asked Cunningham after the offer came in from Alden Leeds for a summary, and he said that the company again proposed a freeze. They knew exactly... This is on line 5, JA-23. Similarly, when DeVito asked Cunningham on November 2nd for a summary of developments and negotiations, Cunningham informed them, responded, and proposed a freeze. They knew exactly what the proposal was. Keep reading the paragraph. There's much more to the findings. The ALJ is saying they were confused. They weren't sure one year, two years, and they weren't sure what the company was proposing. The ALJ... He's confused about the meaning of the e-mail, which is certainly not the height of clarity. The ALJ finds that, but that I would submit to the court. There is not substantial evidence in the record to support that because contemporaneously, when it came in and they discussed it, they knew it was a freeze. They confirmed it was a freeze. He made a fact finding that they discussed on November 2nd that it was a freeze. They never asked for a clarification with regard to this. It says, in fact, that it is a freeze. After discussing the health care proposal and confirming that it had been rejected by the union, at that point in time, they go on to say, we propose and continue a freeze, one year or two years. You choose. There was absolutely no ambiguity based upon the admissions of the union from their internal discussion and otherwise as to what that e-mail meant. And there had never been a change from the company from September 30 onward. And then, of course, a week later, when there were further discussions and even made clear, they again rejected on November 9th with respect to the further proposal that was made even after the lockout began. But I see my time is up. Okay, thank you. May it please the Court, good morning. My name is Jeff Byrd. I'm here on behalf of the National Labor Relations Board. Your Honors, the board found that this October 30 e-mail was, quote, confusing, incomplete, and internally inconsistent. Further, the board credited the testimony of union representatives Cunningham and Troccoli that they were indeed confused by what exactly the company was offering. This was made manifest earlier in the day on October 30th when Epstein raised this issue of the union state that it was going to take the company's offer to its members and have a vote. This being the first Troccoli had heard of this, he asked astutely, vote on what? It was unclear at that point. There's credited testimony. There's been no showing that that credibility finding should be overturned or that the company can meet the high bar to overturn that. Now, the company's offer on October 30th stands in very stark contrast to the first clear offer that it made to the union, which was on November 9th, one week after the unlawful lockout began. The board found that that was the first time a clear offer was made. And a review of that document at JA 123 illustrates precisely what the company is obligated to provide to the union, which is clear terms of what is being offered. This varies substantially from what had been discussed throughout the month of October  and it was this that put the union and its members on notice of what type of proposal they would need to accept in order to avert the lockout. Unfortunately for the company, this offer came too late. It was not able to cure the unlawful lockout with just this notice. It was obligated to return the employees to the status quo by reinstating them, bringing them back to work, ending the lockout, paying them back pay, and resuming negotiations. The company had every opportunity at that point to resume the lockout had it done those things, but it did not. So the board maintains that the record is, despite the company's best efforts throughout its briefs and its argument to show that this October 30 email was clear, it was anything but, and substantial evidence supports that finding. We also, just a few additional notes. I think this was made clear, but this is not a de novo review standard. This is not a collective bargaining agreement that the parties were asking the board to interpret. This is an email in the course of dealings over the course of a month. So under Lytton, under clear precedent, this is not to be given de novo review. Let me just ask you to repeat, what was the significance of the November 9 lockout? Well, after the lockout began on November 3rd, the parties continued negotiations, might be a bit strong of a term, but continued discussing the matter. On November 9th, the company provided this, what it termed, final offer to the union laying out these terms. So that is something that the union can take to its members and vote on in a clear manner. In order to avert the lockout, had it been given in advance of the lockout, but it wasn't. It was the first time that employees were put on clear notice, as the board found, of precisely what the company was seeking. So as far as the case is concerned, this is a strong illustration. It's not a hypothetical, as the board found. It's an illustration of what is a clear offer made to the union, but it was given after the lockout. So you just might as well have drawn examples from other cases. To show what is a clear, sufficiently clear offer. I mean, we certainly could have tried to dig through other cases, but given the facts of this case. I don't see why this sheds any light on the October 30th email, which seems to be up to be red on its face. Well, I believe it contrasts the October 30th email. It tells the employees what type of health benefits they would be voting on. It tells them what they would be paying for it, how the division of those contributions were being made. And I'll note, at the end of this, to show that this was indeed a moving target the company was providing, there is, for the first time, a discussion of the ability to withdraw from the union's pension fund. So this is an illustration of what the board found was a clear notice to the union, whereas in October, on October 30th, again, inconsistent, confusing. This is credited testimony of the union representatives, and is supported by a reading of this email. It mentions staying with the same plan, but it also mentions the possibility of eliminating family coverage. That's not a freeze from what happened in the past. That's a reduction in the benefits that were offered to the employees. This might be different than the offer of October 30th. Right. It's not really, it doesn't bear on us. It doesn't. It isn't really relevant. The question is whether October 30th is clear. This could be offering the same terms in a more clear fashion or different terms. And the fact that they're different seems to me not to be relevant at all. Okay. I was using it by way of illustration, but it does not change the, of course you're correct that it does not change the fact that, of what the October 30th email says. I was using it as an illustration, but I think standing alone, looking alone at the October 30th email, it is clear that it does not provide a notice that can take back to the union. And, again, as Troccoli asked, vote on what? What exactly are we telling the employees that they're going to be getting under this plan? Will they be getting $400 a month for the employee? What type of benefits will they receive under the insurance plan? I'll note that there were many discussions about a one-year freeze. This offer discusses a one-year freeze on wages, a one- or two-year freeze on wages. It doesn't say anything about the union's other various contract proposals. Those were not addressed. The company would have this court, I believe, infer that the freeze would have extended to those other terms. But that's not what this says. It just discusses the wages. So at that point, to suggest that the union members would have known what they were voting on in order to avert the lockout, the board found it was not sufficient. At this point, it seems to me that the appellant's point is relevant here. The whole background leading up to the October 30 telegram is that the employer wanted a freeze across the board, didn't want to have to pay any more than it was currently paying, even if the mix of medical benefits was different. So when it later, in the October 30, refers to wages, I don't see how that really casts any doubt on the employer's position with respect to the other terms. They've been saying it all along. Well, I mean, unfortunately, I don't have the record set to this, but it is in the record in the joint appendix, the other proposals that were offered by the union. Some were non-economic proposals. I mean, these are all things that have to be bargained. And it was not made clear that a freeze would extend to those other terms when it specifies wages. That's correct. I mean, they hadn't been negotiated over these other terms. It was. I want a freeze. I want everything to be the same, which is what he said time after time. Doesn't that answer the question of what about our proposal to do something unrelated to wages or medical benefits? I said I wanted everything to be the same. There have been previous discussions earlier in October to that effect. However, over the course of that month, there were different medical plans. They were moving from a union-sponsored plan to a company-provided plan. There was discussions with the broker. There was a great deal of uncertainty that was injected into the process that is illustrated in this October 30th email. The board has not interpreted this in a vacuum, as the company has suggested. However, when it came to decide in October, October 30th, when Trockley informed Epstein, I don't know what you want them to vote on, this was his response. Let me ask you this. One of the things I think that the board enumerated as illustrating confusion or lack of clarity was the one versus two years. That's not really a problem, is it? No, it's not. If you say here's our proposal for either one year or two years, they can vote on that. Well, the board, in fact, did not rely on that. The ALG did, but in the boards, I believe it's footnote three. They stepped back from that finding. So, no, we're not maintaining that that was part of that. With just a minute left, I would just briefly address the issue of the remedy. There's been a great deal of argument in the briefs, although not yet this morning, about whether or not it should be deferred. A portion of this case should have been deferred to the board's well-established compliance proceeding on the issue of whether that November 9 email not only cured the unlawful taint created by this unlawful lockout, but whether or not there was an adverse impact on ongoing bargaining. The company has the opportunity to meet a burden of showing that there was no adverse impact by the nature of the unlawful lockout. And if that's the case, a cure would end the company's liability. And the company has gone to great lengths to suggest that this is a matter, based on one board case or a footnote in a board case, that this is a matter that should have been deferred to compliance. This is a straightforward application of 10E of 29-160E of the Act that states that the company had the obligation to raise this matter before the board. It failed to do so. It was on notice from the ALJ's administrative law judge's decision that there was no such finding that it met its burden, to the extent that there was any uncertainty about when the company was obligated to raise this. That uncertainty was dissolved when the board stated in its footnote to its decision that no further litigation was warranted in this case because the matter had not been properly raised. The company then continued to sit on its rights. It did not file a motion for reconsideration with the board. And as a result, we would maintain that Trump Plaza, on which it relies, is distinguishable. And the court's many decisions, including all in manufacturing and a recent decision in a Healthbridge case last month, clearly established that 10E does create a bar to those arguments. I see that I'm out of time.  Thank you, Your Honor. Mr. Fiorenzo, I think you're out of time, but you can take a minute if you'd like. Thank you. Just let me clarify one or two points. An argument was just made a moment ago about there were changing positions prior to October 30. The testimony of Mr. Tricoli, which is at JA 237, on October 30, when he discusses with Epstein where the negotiations are at, they discuss the health care will remain at the same, quote, contribution level, which will result in a cut in benefits. When that's discussed, the question is, quote, and what, if any, response did Mr. Epstein give to that answer? Mark said once again, you don't understand. I just want to keep everything the same. I don't want to pay anything more. I don't want to, you know, I want to keep everything the same for one year. That position never changed. They knew it on October 30, and the October 30 email confirms that. It says exactly that. There's a freeze in place. There was no ambiguity. These facts were well known, and there was never a question about it. So with regard to the October 30 email, when we look at it in the context of the admissions in the record, which were disregarded and ignored by the ALJ, I believe the conclusion of this court should be that there was no ambiguity concerning the position, that the union knew what to do to avert the lockout, which was simply same terms and conditions that existed under the agreement as was made plain throughout. Thank you. Thank you. Case submitted. Thank you both.
judges: Tatel, Edwards, Ginsburg